1

2

3

4

5

6

7

8

9

10                      IN THE UNITED STATES DISTRICT COURT

11                          FOR THE DISTRICT OF OREGON

12                            PORTLAND DIVISION

13   JEFFREY R. PETERSON,            )
                                     )
14                   Plaintiff,      )
                                     )        No.  CV-10-586-HU
15        v.                         )
                                     )
16   ACUMED, LLC,                    )
                                     )
17                   Defendant.      )        OPINION & ORDER
                                     )
18   _____)

19

20   Paul Breed
     815 SW Second Ave., Suite 500
     Portland, OR 97204
21

22        Attorney for Plaintiff

23   Courtney Angeli
     Buchanan Angeli Altschul & Sullivan LLP
     321 SW Fourth Ave., Suite 600
24   Portland, OR 97204

25        Attorney for Defendant

26

27

28

HUBEL, Magistrate Judge:

Before the court is defendant Acumed, LLC's Motion for Summary Judgment [#30].    For the reasons set forth below, I deny the motion.

**FACTS**

Plaintiff Jeffrey Peterson worked for defendant Acumed, LLC as a controller.  Acumed is a privately held company owned by Robert Pritzker, who also owns a company known as Colson.  Acumed is a Colson Associated Company, and has a consulting arrangement with Colson whereby it reports to and consults with Colson regarding various operational matters.

As controller for Acumed, Peterson reported to, among others, Louhan Tucker, the chief financial officer and corporate controller of Colson.  During 2009 Tucker expressed his dissatisfaction with Peterson on a number of occasions.  Tucker's dissatisfaction with Peterson led Peterson to contemplate resignation from Acumed in late 2009.  On December 29, 2009, Peterson met with a representative of Acumed's human resources department, Noel Van Dyke, and told her that he was "considering resigning."  Angeli Decl. Ex. 2, at 53.  Peterson "asked her about the potential to receive severance pay in connection with a resignation."  Id. at 54.  He told her "that Acumed should give [him] a separation package that mirrored Karsten's severance."  Id. at 55.

As controller, Peterson was familiar with the severance packages of at least two former Acumed employees, Sue Mockridge and Karsten Zuendel.  Specifically, David Jensen, Acumed's president, had called Peterson about Karsten Zuendel and "told [Peterson] what he was going to do on a severance package, [and] asked [Peterson's]

OPINION AND ORDER 2

1 opinion if [he] thought it was acceptable, and [Peterson] said it
2 was."  Decl. Courtney Angeli, Ex. 2, at 55.

3      Van Dyke testified that during the December 29 meeting,
4 Peterson told her he thought "that Acumed would be doing the right
5 thing if we gave him a separation equivalent to what Karsten
6 Zuendel . . . received, which was six months separation pay and six
7 months of COBRA continuation."  Angeli Decl. Ex. 4, at 18.
8 Peterson and Van Dyke agreed not to take any action based on the
9 conversation until Peterson thought more about the decision.

10      Shortly thereafter, Peterson left on a business trip to China.
11 Near the end of the China trip, Peterson either called or sent a
12 text message to Van Dyke and indicated he wanted to go forward with
13 what they had discussed at the December 29 meeting.

14      On January 11, 2010, Van Dyke had a phone conference with
15 Jensen and Alan Kozlowski and recommended, "based on Jeff's tenure
16 with the company, we consider  recommending a separation of six
17 months continuation of pay and six months of COBRA continuation."
18 Id.  According to Van Dyke, "We ended that conversation agreeing
19 that we needed to contact Louhon Tucker because his approval would
20 be needed for such a severance, and he should be notified that Jeff
21 had resigned."  Id. at 18-19.  According to Peterson, he had not
22 yet resigned, and communicated to Van Dyke only that he "want[ed]
23 to move ahead on working on a solution."  Angeli Decl. Ex. 2, at
24 63.

25      "First thing in the morning" on January 12, 2010, Van Dyke,
26 Jensen, Kozlowski, and Tucker had a conference call.  Angeli Decl.
27 Ex. 1, at 17-18.  When asked in his deposition what he said during
28 the conversation, and what Tucker said during the conversation,

OPINION AND ORDER 3

Jensen made no mention of discussing a severance package. Id. at 18-19.  After the call, Van Dyke sent the parties to the call an email messaging summarizing what they talked about.  She wrote,

> Considering Jeff's tenure with Acumed and his executive-level position, in our discussion with you we all agreed that his separation agreement will likely include the following:
>
> • Up to 6 months pay at his current salary, payable every two weeks on payday (ending if he finds employment before 6 months)
>
> • COBRA continuation (medical and dental) for his family for up to 6 months
>
> • Outplacement services at Lee Hecht Harrison (Dollar amount limit around $8K - I will see what we paid for Karsten's for comparison)
>
> We did not specifically discuss the next two items, but I would like to include them in this type of severance:
>
> • Letter of recommendation at Jeff's request
>
> • Will not contest unemployment
>
> Please review this information with Bob[1] at your earliest convenience and I'll work through Tony Dombrow to make sure the final separation agreement is accurate and complete.

Decl. Paul Breed Ex. 7, at 2.

Later that day, Peterson met with Jensen.  According to Peterson, Jensen opened the meeting by saying "I'm aware that you would like to resign your position."  Id. at 68.  According to Peterson, Jensen said that he had talked about Peterson's departure with Van Dyke, Tucker, and Koslowski. Id. at 70.  Peterson recalls that Jensen communicated to him that Acumed would create a

---

[1] Robert Pritzker is the owner of both Acumed and Colson.

severance package that was "[b]etter than what they did for Karsten." Id. at 68. According to Jensen, he "said that Acumed would work to create a severance for him similar to what we did for Karsten Zuendel." Angeli Decl. Ex. 1, at 20. Peterson was under the impression that Jensen had authorization from Colson, by talking to Tucker and Kozlowski, to offer a severance package. Angeli Decl. Ex. 2, at 70. Although Jensen did not say there were any strings attached to the offer of severance, Peterson told Jensen he was "willing to do whatever Acumed needed to make a clear transition to operating in [his] absence." Id. at 68. Jensen called Nancy Stout, Peterson's successor, into the meeting, and Peterson informed her "I'm leaving Acumed." Id. at 69. According to Peterson, the people at the meeting discussed "figur[ing] out what [his] last day is," but did not agree on a date. Id.

According to Acumed, it was company policy that severance packages for employees above a certain level needed to be approved by Colson. Peterson testified he was aware that "if you were going to give somebody a raise at the level of $9000 a month and above, you had to have this signed by Colson." Decl. Courtney Angeli, Ex. 2, at 23. Likewise, Peterson knew that "A PAR[2] concerning me would require the signature of Louhon Tucker," from Colson. Angeli Decl. Ex. 2, at 24-25. Peterson testified that he did not know, however, that Colson needed to sign a document authorizing an offer of

---

[2] A "PAR" is a Personnel Action Request. Angeli Decl. Ex. 5, at 7. The Colson Associates Policy Manual details that a PAR must be used for "special salary arrangements." Id. "Examples of special arrangements include but are not limited to: car allowance or estimated sales commission." Id.

OPINION AND ORDER 5

severance pay to him.  Id. at 70.  Van Dyke testified that "when the president says that a salary increase is granted to someone, it is assumed that he has obtained the proper approvals," and "It's the president's responsibility to get those approvals."  Breed Decl. Ex. 4, at 2-3.  Van Dyke clarified that regarding a salary increase or a bonus, "it is not the employee's job to say, 'was this approved?'"  Id. at 5.

Peterson testified, "Mr. Jensen had talked to Colson, he had talked to Alan, he had talked to – "Colson" being Alan and Louhon, and said, 'We're going to treat you better than we treated Karsten.'"  Angeli Decl. Ex. 2, at 70.

Following the meeting with Jensen, Peterson talked with Van Dyke.  According to Van Dyke, "Jeff came to my office and was visibly, you know, excited that he had received this information; and I reminded him again that we had no information or approval from Colson."  Breed Decl. Ex. 3, at 9.  Peterson acknowledges he talked with Van Dyke after the meeting with Jensen, but does not recall her reminding him that Acumed couldn't make an offer without approval from Colson.  Angeli Decl. Ex. 2, at 71.

According to Van Dyke, after Jensen's meeting with Peterson,

> "David . . . called Louhon, and Louhon reminded David that it was premature for him to put severance terms on the table, and that a termination date had not yet been established.  And within 24 hours, David circled back to Mr. Peterson and said, 'I spoke prematurely.  Nothing has been authorized by Colson yet.'  So that would have been on January 13."

Breed Decl. Ex. 3, at 7.  On January 14 or 15, 2010, Peterson met with Jensen and Van Dyke once again.  According to Peterson, Jensen and Van Dyke communicated that "they would like to have their

OPINION AND ORDER 6

1  controller through the audit." Angeli Decl. Ex. 2, at 73. The
2  audit was scheduled to conclude on March 5, 2010. Peterson
3  testified, "They said the severance package I received would be the
4  same, assuming I . . . you know, that I behaved, I believe that was
5  the term, during the audit." Id. Peterson alleged that Van Dyke
6  said, "It's the same package, it just starts in March, in six
7  weeks, not today." Peterson remembers, "they took my severance off
8  the table of the January – they said, 'We won't pay you a severance
9  unless you stay until March 5th' . . . . And Louhon said your bonus
10 is back on the table.'" Id. at 77.

11    At that point, Peterson allegedly requested a written
12 guarantee of his severance package coming out of the meeting, and
13 was told that it was not possible. Peterson "believe[d] they were
14 unable to do it because Louhon wouldn't – they felt they did not
15 want to communicate that to Louhon." Id. at 76. Peterson alleges
16 he was mad because they had changed the deal, but that his anger
17 was eased by reassurances he got from Jensen: "I said, 'I don't
18 trust Louhon Tucker,' and David said, 'Well, you trust me, don't
19 you?' And I said, 'Absolutely.'" Id. at 78. Peterson testified
20 that he agreed during that meeting to work until March 5, 2010.
21 Id. at 79.

22    Peterson worked until early March. The declarations do not
23 make clear when it occurred, but near the end of Peterson's
24 employment, he was called to a meeting with Van Dyke and Kozlowski,
25 and Jensen was present by telephone. At the meeting Jensen
26 informed Peterson he would not receive a bonus, and Peterson was
27 given a written severance package offer with a deadline of March
28 26, 2010, for acceptance. The offer was for $58,500, which was

OPINION AND ORDER 7

five months' pay, payable every two weeks, five months of COBRA benefits, and $8,000 in outplacement services.  The offer was to end if Peterson found other employment prior to the end of the five month period.  According to Van Dyke, "There was a lot of yelling when David was on the phone calling David a liar," and Peterson was "shaking and very visibly upset."  Breed Decl. Ex. 3, at 12. Peterson did not accept the severance offer by March 26, 2010.  He initiated this lawsuit on May 24, 2010.

### STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'"  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

OPINION AND ORDER 8

The substantive law governing a claim determines whether a fact is material. <u>T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. <u>T.W. Elec. Serv.</u>, 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. <u>Id.</u>; <u>In re Agricultural Research and Tech. Group</u>, 916 F.2d 528, 534 (9th Cir. 1990); <u>California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).

## DISCUSSION

Peterson's Complaint alleges a claim for Unpaid Wages under ORS 65.140,[3] demanding six months severance pay, or $70,000, and the value of six months of health insurance, or $6,000. Acumed moves for summary judgment against Peterson's claim.

Whether Peterson's claim will survive summary judgment depends on the law of contracts. Acumed argues that any alleged contract is unenforceable because the parties did not agree on sufficiently definite terms, and because any alleged contract was not supported

---

[3] ORS Chapter 65 relates to general provisions for nonprofit corporations, and ORS 65.140 does not exist. Paragraph 11 of plaintiff complaint makes clear that he brings a claim under ORS 652.140, "Payment of wages on termination of employment."

OPINION AND ORDER 9

1   by consideration.   Peterson disagrees, and argues that even if
2   there was no contract, he may still have a remedy under the
3   doctrine of promissory estoppel.   Acumed contends Peterson did not
4   allege a claim for promissory estoppel in his complaint, and it is
5   impermissible to do so in response to a motion for summary
6   judgment.   I address each of the arguments in turn.

7   I.   <u>Definiteness of Contract</u>

8       Whether a contract exists is a question of law.   <u>Dalton v.</u>
9   <u>Robert Jahn Corp.</u>, 209 Or. App. 120, 132, 146 P.3d 399 (2006), <u>rev.</u>
10  <u>den.</u>, 342 Or. 416, 154 P.3d 722 (2007).   It is a longstanding
11  principle of contract law that, "the formation of a contract
12  requires a bargain in which there is a manifestation of mutual
13  assent to the exchange and a consideration."   <u>Ken Hood Const. Co.</u>
14  <u>v. Pacific Coast Const., Inc.</u>, 201 Or. App. 568, 578, 120 P.3d 6,
15  11 (2005) (quoting Restatement (Second) of Contracts § 17(1)
16  (1981)).   "When the dispute concerns an unwritten agreement, the
17  conclusion that the parties manifested mutual assent must be
18  constructed from evidence of their negotiations or other past
19  conduct."   <u>Kabil Developments Corp. v. Mignot</u>, 279 Or. 151, 158,
20  566 P.2d 505, 509 (1977)(internal quotations and citations
21  omitted).   "It must be constructed from their communications and
22  overt acts, not their undisclosed intents and ideas."   <u>Id.</u>   Put
23  otherwise, "Oregon follows the objective theory of contracts," and
24  the existence of a contract depends on the parties' "objective
25  manifestations of intent to agree to the same express terms."
26  <u>Sollars v. City of Milwaukie</u>, 222 Or. App. 384, 389, 193 P.3d 75,
27  78 (2008).   "[A]s the Oregon Supreme Court has . . . explained,
28  mutual assent, or what historically was considered as the 'meeting

OPINION AND ORDER 10

of the minds' requirement, may be expressed in words or inferred from the action of the parties. Whether a statement or act is a manifestation of assent is a question of fact." <u>Martin v. Comcast of Cal./Col./Fla./Ore., Inc.</u>, 209 Or. App. 82, 97, 146 P.3d 380, 388 (2006)(internal citations and quotations omitted). "[W]hether the express terms of an agreement were indefinite [is] an issue for the court." <u>Pritzker v. Carr</u>, 113 Or. App. 310, 313, 832 P.2d 1250, 1251 (1992). "[W]hether the parties gave a definite meaning to an ambiguous term [however] . . . . is a question of fact for the jury." <u>Id.</u>

Here, there were two meetings between Jensen and Peterson where an oral contract may have been formed.

II. <u>January 12 Meeting</u>

To begin, the parties dispute whether Peterson had already resigned when the January 12 meeting took place. There is no written evidence of a resignation. According to Acumed, when Peterson called or sent a text message to Van Dyke towards the end of the January 2010 China trip, he communicated that he was resigning. According to Peterson, he did not resign, but communicated that he was thinking about resigning, contingent on working out the details of a severance package. The testimony of Van Dyke and Peterson differ on this point, and there is no written evidence. Thus, there is a question of fact as to whether Peterson had already resigned when the January 12 meeting took place. The evidence in the record must be evaluated by the finder of fact both with respect to determining what in fact was said by Peterson and what those words objectively manifested.

OPINION AND ORDER 11

On the morning of January 12, Jensen had a conference call with Tucker, Van Dyke, and Koslowski. Following the meeting, Van Dyke wrote an email to the call participants detailing that they had "all agreed" that Peterson's severance package would likely include "Up to 6 months pay at his current salary," and "COBRA continuation (medical and dental) for his family for up to 6 months," in addition to outplacement services. Van Dyke recommended it also include a letter of recommendation and a promise not to contest unemployment.

When Jensen met with Peterson later on January 12, Peterson alleges that Jensen told him that he was aware Peterson would like to resign, that he had talked with Tucker and others, and Acumed would give Jensen a severance package "better than what they did for Karsten." Jensen remembers saying "Acumed would work to create a severance for him similar to what we did for Karsten Zuendel." Both Jensen and Peterson knew that Karsten Zuendel received six months of his salary and six months of benefits for his severance package. This is the same basic package Van Dyke detailed in her email detailing what was discussed on the phone call earlier that day. According to Peterson, he accepted this "offer," and promised he was "willing to do whatever Acumed needed to make a clear transition to operating in [his] absence."

Acumed argues that the evidence related to this meeting is insufficient to establish an oral contract because there was no consideration and the terms were not sufficiently definite.

A.    Consideration

A bilateral contract exists where "the mutual promises of the parties to the agreements are the consideration which supports it."

OPINION AND ORDER 12

1  <u>Temple Enterprises v. Combs</u>, 164 Or. 133, 152, 100 P.2d 613, 621
2  (1940).

3      In this case, the evidence creates a creates a triable issue
4  of fact whether there was a bilateral contract.  If Peterson is
5  believed, Jensen promised him better than six months pay and six
6  months of medical benefits in exchange for his resignation, or his
7  promise to resign.  Peterson's alleged promise to resign and "to do
8  whatever Acumed needed to make a clear transition to operating in
9  [his]  absence,"  is  a  promise  that  would  be  sufficient
10 consideration.

11     "[T]he  first  lesson  in  contracts  [is]  the  peppercorn
12 theory-that  courts  will  not  inquire  into  the  adequacy  of
13 consideration, so long as it was true and valuable."  <u>Pope v.</u>
14 <u>Savings Bank of Puget Sound</u>, 850 F.2d 1345, 1356 (9th Cir. 1988).
15 Here, the evidence of record leaves a triable issue of material
16 fact for the jury.

17     B.   <u>Definiteness</u>

18     A contract is sufficiently definite to be enforceable when it
19 is "definite in all material respects, with nothing left for future
20 negotiation."  <u>Booras v. Uyeda</u>, 295 Or. 181, 191, 666 P.2d 791
21 (1983).  The caveat to this rule is that "minor details may be left
22 to future agreement." <u>Lang v. Oregon-Idaho Annual Conference</u>, 173
23 Or. App. 389, 397, 21 P.3d 1116 (2001).  "A term is 'material' to
24 an enforceable  agreement  when  it  goes  to  the  substance  of  the
25 contract and, if breached, defeats the object of the parties in
26 entering into the agreement." <u>Johnstone v. Zimmer</u>, 191 Or. App.
27 26,  34,  81  P.3d  92  (2003)  (citation  omitted).   "Whether  a
28 contractual  term  is  material  is  a  question  for  the  factfinder

OPINION AND ORDER 13

unless the uncontested evidence leads to only one legal conclusion." Dalton v. Robert Jahn Corp., 209 Or. App. 120, 140, 146 P.3d 399, 410 (2006).

Here, Van Dyke's January 12 email, Jensen's statements, and Peterson's statements create a question of fact whether both Jensen and Peterson considered that the material terms of the alleged oral contract included at least six months of salary and six months of medical benefits. The factual dispute is what Jensen actually said.

III. January 14-15 Meeting

According to Peterson, at the meeting on January 14 or 15, Jensen and Van Dyke communicated that "they would like to have their controller through the audit," which was scheduled to conclude by March 5, 2010. Peterson testified, "They said the severance package I received would be the same, assuming I . . . you know, that I behaved . . . during the audit." Id. Peterson alleged that Van Dyke said, "It's the same package, it just starts in March, in six weeks, not today." Peterson remembers, "they took my severance off the table" and said, "We won't pay you a severance unless you stay until March 5th." When Peterson asked for a written guarantee, Jensen allegedly said it wasn't possible, but, "You trust me, don't you?" According to Peterson, he agreed during that meeting to work until March 5, 2010. Id. at 79.

"Whether a statement or act is a manifestation of assent is a question of fact." Martin, 209 Or. App. at 97. Whether Jensen's statement about "trust," and Peterson's promise to work until March 5 (and performance of the promise) are found to be manifestations of mutual assent is a question of fact for the jury.

OPINION AND ORDER 14

1   To the extent no contract was formed during the second
2   meeting, the same questions of fact remain about whether a contract
3   was formed during the first meeting.  If Peterson is believed that
4   Van Dyke said, "It's the same package, it just starts in March, in
5   six weeks, not today," then the same question of fact from the
6   January 12 meeting remains: Which terms constitute the package?
7   Accordingly, I find that a question of material fact exists
8   sufficient to survive Acumed's motion for summary judgment.
9   IV.  <u>Promissory Estoppel</u>
10  In Peterson's Response to Acumed's motion for summary
11  judgment, Peterson argues that even if the alleged oral contract
12  was not sufficiently definite, Peterson still has a remedy under
13  the doctrine of promissory estoppel.  Peterson did not plead
14  promissory estoppel in his Complaint.  Therefore, Acumed argues
15  that the court should not consider his promissory estoppel
16  argument.
17  "In Oregon promissory estoppel is not a cause of action in
18  itself, but is a subset of and a theory of recovery in breach of
19  contract actions."  <u>Kraft v. Arden</u>, CV No. 07-487-PK, 2008 WL
20  4866182, at *10 (D. Or. 2008).  This court generally does not
21  consider a new claim on summary judgment absent amendment of the
22  pleadings.  <u>Id.</u>  However, if the allegations of the Complaint are
23  sufficient to allege a promissory estoppel claim, the court may, at
24  its discretion, reach the promissory estoppel claim on summary
25  judgment.  <u>Id.</u>
26  Under promissory estoppel, the party seeking enforcement of a
27  promise must demonstrate: (1) a promise, (2) which the promisor, as
28  a reasonable person, could foresee would induce conduct of the kind

OPINION AND ORDER 15

1  which occurred, (3) actual reliance on the promise, (4) resulting

2  in a substantial change in position." <u>Bixler v. First Nat'l Bank</u>,

3  49 Or. App. 195, 199, 619 P.2d 895 (1980).

4      Here, the complaint alleges, "In January, 2010, plaintiff

5  discussed severing his employment relationship with Acumed in a

6  conversation with Acumed's President, David Jensen." Compl. ¶ 4.

7  But, "Jensen told plaintiff that if he would continue working for

8  Acumed until a pending audit was completed, plaintiff would receive

9  six month's severance pay and a bonus." Compl. ¶ 5. The Complaint

10  continues, "In reliance on the promise, plaintiff continued working

11  for Acumed." Compl. ¶ 5.

12      Such allegations state the elements of a claim for promissory

13  estoppel: (1) Jensen allegedly made a promise to pay a certain

14  severance package if Peterson stayed through the audit, (2) Jensen

15  could have reasonably foreseen that his promise would induce

16  Peterson to stay through the audit, (3) Peterson did stay through

17  the audit, and (4) Peterson would have otherwise left the position

18  earlier. Whether each element of the promissory estoppel claim

19  factually exists is an issue that must be addressed by a finder of

20  fact. The record before the court does not eliminate any

21  particular element.

22      Peterson's promissory estoppel theory, therefore, creates

23  another reason why summary judgment must be denied.

24  ///

25  ///

26  ///

27  ///

28  ///

OPINION AND ORDER 16

1

**CONCLUSION**

2      Defendants' Motion for Summary Judgment [#30] is denied.

3 IT IS SO ORDERED,

4

5      Dated this 25th day of April, 2010.

6

7                              /s/ Dennis J. Hubel

8                              _____
                               Dennis James Hubel
9                              United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPINION AND ORDER 17